IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE

Assigned on Briefs November 18, 2025

## JACQUIZ MCBEE v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Knox County**
**No. 128759      Steven Sword, Judge**

_____

**No. E2025-00053-CCA-R3-PC**

_____

A Knox County jury convicted the Petitioner, Jacquiz McBee, of first-degree murder, and the trial court sentenced him to life in prison to be served consecutively to his prior three-year sentence for aggravated assault.  The Petitioner appealed his conviction and sentence, and this court affirmed both.  *State v. McBee*, No. E2021-01048-CCA-R3-CD, 2022 WL 16833562, at *1 (Tenn. Crim. App. Nov. 9, 2022), *perm. app. denied* (Tenn. Mar. 9, 2023).  The Petitioner filed a petition pursuant to the Post-Conviction DNA Analysis Act asking that evidence in his case be tested for DNA and undergo fingerprint analysis.  The post-conviction court summarily dismissed the petition.  The Petitioner appeals, maintaining that the trial court abused its discretion when it denied his petition for fingerprint and DNA analysis of evidence in his case.  After review, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, P.J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and MATTHEW J. WILSON, JJ., joined.

Jacquiz McBee, Clifton, Tennessee, Pro Se.

Jonathan Skrmetti, Attorney General and Reporter; Lacy E Wilber, Senior Assistant Attorney General; and Charme P. Allen, District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from the shooting death of the victim, Jessica Davis, who was the Petitioner's ex-girlfriend and mother of his four-year-old son, L.M.  The Petitioner claimed that the victim shot herself while they were wrestling for the gun.  The case proceeded to

trial, and a Knox County jury convicted him of first-degree murder. The Petitioner appealed his convictions and sentence, and this court affirmed. *State v. McBee*, No. E2021-01048-CCA-R3-CD, 2022 WL 16833562, at *1 (Tenn. Crim. App. Nov. 9, 2022), *perm. app. denied* (Tenn. Mar. 9, 2023).

## A. Trial Facts

We briefly summarize the facts, all taken from *McBee*, 2002 WL 16833562, at *1-13, as follows: Law enforcement officers were dispatched after the Petitioner called 911 on April 16, 2018, at 9:16 p.m. During the call, the Petitioner told the operator that his son's mother, the victim, attempted to shoot him. He sounded frantic, said "I'm scared!" repeatedly, and had difficulty articulating his location. After repeated questions from the 911 operator, the Petitioner provided his location and apartment number. The Petitioner stated that he had L.M. sitting on his lap when the victim began pointing a gun at him, but he thought it was a BB gun. He thought she was kidding until he heard a click. He pushed his son away and wrestled the victim for the gun. She was on top of him and pulled the trigger while the gun was pointed at her, shooting herself.

The Petitioner told the operator that the victim was shot and in the kitchen of apartment, but he stated that he did not know where on her body she was shot because he did not want to see her. He said that the victim, who was "really aggressive," shot herself. The Petitioner expressed disbelief that the victim had a gun and also expressed concern that he himself could have been injured.

At one point during the call, a child's voice can be heard making reference to a gun, and the Petitioner states, "She had a gun? How do you know she had a gun? She shouldn't have a gun around you, Baby."

The victim's best friend, Waynesha Murphy, testified that she had known and lived with the Petitioner and the victim while they were together. They had broken up about two years prior to the shooting. Eight months to a year before her death, the victim began dating an older man, Nicholas Smith, with whom she had a good relationship. Ms. Murphy had never known the victim to possess a gun or express any reason to harm herself.

Ms. Murphy testified that the victim, who had custody of L.M., contacted her sometime between 3:00 and 4:00 p.m. on the day of the shooting and "was a little nervous about seeing [the Petitioner]." Ms. Murphy testified that the victim had been upset with comments that the Petitioner's girlfriend, Leah Vasquez, had made on social media "disrespecting" the victim as L.M.'s mother. Ms. Murphy said that the victim had an issue with Ms. Vasquez posting pictures of herself with L.M. on social media. She said, "I

honestly just think that [the Petitioner] just wanted to paint a type of picture of himself because he wasn't financially providing for [L.M.]. Nicholas [Smith] was."

Ms. Murphy testified that the victim was a happy person, and Ms. Murphy had no reason to think the victim would take her own life. Ms. Murphy went to the victim's house around 5:30 p.m. before the shooting, and the victim cooked her some ribs. The two took a shot or two of alcohol, and Ms. Murphy left because she did not want to see the Petitioner. The victim was supposed to call her after the Petitioner left, and Ms. Murphy planned to return so they could eat ribs together. Ms. Murphy opined that the victim would never have had a gun around L.M. and that she had even thrown away toy guns that the Petitioner had purchased for L.M.'s birthday.

During cross-examination, Ms. Murphy said that she was not aware that the victim had made a video threatening Ms. Vasquez. Ms. Murphy was aware that the victim had once texted the Petitioner that she was fearful of Mr. Smith; however, the victim was drunk and did something "stupid" when she sent the text and lied about the argument.

Nicholas Smith, the victim's boyfriend of eighteen months, said that they had a loving relationship and that he supported both her and L.M. Mr. Smith testified that there were no physical altercations between him and the victim, and he never possessed a gun around her. He also said that he never held a gun to her head, and she did not own a gun. Mr. Smith testified that the victim did not allow guns around L.M., including toy ones.

Mr. Smith recalled that the victim was an easy-going and positive person but did have some difficulty with one of the Petitioner's girlfriends. Mr. Smith dropped the victim off at home at 4:00 p.m. on the day of the shooting and planned to return later to eat, after the Petitioner had left.

Law enforcement officers who responded to this 911 call found the Petitioner standing outside the apartment, appearing upset and distraught. Footage from officers' body cameras showed the Petitioner and L.M. approaching the officers, and L.M. said, "My mommy dead," to which Petitioner replied, "Shut up, [L.M.]. You don't know that." The deputy encouraged the Petitioner to avoid having the conversation in front of L.M., and the Petitioner began speaking to someone on the phone. With L.M. still at his side, he said "Baby, I'm at J.C.'s house. J.C. was kind of aggressive. I don't know what's going on. I think she was probably drinking. She had a pink – she got a pink gun. Police are here. Maybe she shot herself."

Officers asked the Petitioner what happened and he recounted similar facts to the one he articulated to the 911 operator. He told them that he tried to wrestle the gun away from the victim before she shot herself.

3

Law enforcement officers retrieved the weapon and traced its history. Zachery Helton purchased a pink Cobra .380 caliber pistol in 2017 from Midsouth Pawn. He decided to sell the gun in the Spring of 2018, but he did not remember the buyer. Demarcus O'Neal identified the pink pistol found at the scene of the shooting and said he saw the gun listed for sale on Armslist and purchased it for his girlfriend in March of 2018. She did not want the gun, so he decided to "get rid of it," and sold it "a couple of weeks after [he] purchased it." Mr. O'Neal identified the Petitioner from a "photo spread" in 2018 and at trial as the person who bought the gun from him.

A forensic analysis of the Petitioner's iPhone revealed a web history that included deleted entries for "Armslist, Knoxville Handgun Classified[.]" It also showed that the contact information for Mr. O'Neal, who identified the Petitioner as the man who had purchased the pink handgun from him, was saved as "Tool Guy." Before the shooting, the Petitioner had searched on Google for "killing someone in self-defense while on probation" and received several articles, one entitled "Convicted Felon Faces Charges for Defending Self Against Violent Home Invader"; another entitled "Limits on Self-Defense"; and a third article entitled "Probation, stand your ground, peaceful journey . . . etc." A "cookies" report from the Petitioner's phone indicated that the articles were accessed on the phone.

A detective with the major crimes unit testified that as part of the investigation, officers collected gunshot residue kits, lifted fingerprints, and performed a DNA analysis on the gun. The scene was also photographed and videoed, and a spent shell casing and a magazine clip were found near the victim's body. The Petitioner's DNA and fingerprints were taken and compared to those found on the gun, but those tests were negative. The detective noted that the Petitioner admitted to touching the gun. Detective McFarland testified that an ATF trace on the gun came back to Mr. Helton, who was cooperative about who had purchased the gun. Through Mr. Helton's phone, Detective McFarland discovered that Mr. O'Neal purchased the gun from Mr. Helton.

A detective interviewed the Petitioner during the early morning hours of April 17, 2018, and he told the detective that, before the shooting, he was sitting on the couch in the living room with L.M. sitting on his lap, and the victim was walking back and forth and talking aggressively. The Petitioner claimed that he ignored the victim because he was there to spend time with L.M. He said that he and the victim "talked a little, but nothing – like trying to catch up on each other." The Petitioner told the detective that when the victim walked back to the kitchen, he heard L.M. say, "Look, Daddy. Mommy has a gun." He saw the victim with a "pink .22" that he "thought it was a toy gun." He said that the victim pointed the gun, but she was smiling so he thought that she was "playing." He heard the gun "click," and he pushed L.M. into the living room toward the door. He then approached

4

the victim and pushed her back into the kitchen up against the wall. The victim "somehow pushed [him] away," and as he pushed back, "[t]hat's when [he] heard the gun go off."

The Petitioner told the detective that the victim had stopped him from seeing L.M. and taking him places. He said the two had broken up because of her problems with alcohol. The victim met Mr. Smith through a friend that sold drugs, and she told the Petitioner that Mr. Smith had threatened her with a gun. She stayed with Mr. Smith because he financially supported her. The Petitioner said he made multiple calls to police to report Mr. Smith's behavior and to get the victim help. The detective could only find one incident report, and he did not find any reports or calls for service for any incidents between the victim and Mr. Smith.

The Petitioner sent several letters from prison from a return address reflecting "Ryan Stansberry" at the correctional institution. The letters were attributed to the Petitioner based on their content and TBI handwriting analysis, and he later admitted that he wrote them. In each of the letters, the Petitioner asked the recipients to find witnesses to perjure themselves and confirm his story. In the letter to "Marcus," the Petitioner asked him to reset his Gmail password "asap" and also get someone to delete internet searches he made on the day of and the day after the shooting. The Petitioner claimed that he sent the letter to help himself because he was scared about the proof in this case. He agreed that, in the letters, he asked the individuals to find a witness to lie to the jury and commit perjury.

Gunshot residue was found on the victim's hands but not on the Petitioner's hands. Concerning the lack of gunshot residue on the Petitioner's hands, a TBI Special Agent testified that there were multiple reasons that gunshot residue may not have been found on the Petitioner's hands.

The medical examiner testified that "most suicidal gunshot wounds are at contact range," and this wound was at "intermediate range." The medical examiner had no indication, and had not been provided evidence, that indicated that this wound was self-inflicted.

The Petitioner described his relationship with the victim had as "on and off." During early December 2017 until the time of the victim's death, she wanted emotional attention from him, but he could not give her physical attention because he was in another relationship with Ms. Vasquez.

The Petitioner said that the victim was upset when he and Ms. Vasquez posted a picture on social media that showed the Petitioner, Ms. Vasquez, and L.M. at a restaurant. The victim began texting and calling Ms. Vasquez. The Petitioner said that the victim was fearful of Mr. Smith and that Mr. Smith physically abused her. The Petitioner said he

bought the victim the pink Cobra pistol from Mr. O'Neal for her protection in March 2018, and he delivered it to the victim at her mother's house. He admitted that he initially lied about the gun to Detective McFarland because he was "scared," and he was on probation at the time and not supposed to be around any guns.

On the day of the shooting, the Petitioner made plans with the victim to see L.M. after work. They agreed that the Petitioner would go over to the victim's apartment at "probably 8:00 maybe." The Petitioner got to the apartment, and the victim was at the door with L.M. standing in front of her. He said that he began "hugging on" L.M., and he gave the victim a hug too. The Petitioner testified that the victim hugged him back, grabbed his butt, and then walked downstairs. He said that the victim came back upstairs, and everything seemed fine until the victim brought up relationships and what she perceived to be the Petitioner's lack of respect for her.

The Petitioner agreed that he took several videos of the interactions between him and the victim that day because "I knew if I were to bring it to court during the child custody so they can see or get a visual of how our relationship was and the condition, circumstances of how [L.M.] was living." The Petitioner testified that before he started the video, the victim told him that she loved him and wanted to "make it work." She also complained about the Petitioner being in a serious relationship. The Petitioner said that the victim also began talking about child support.

The Petitioner said that the victim took medicine for anxiety and, sometimes, when she got mad at him, she would say, "You make me want to kill myself."

Before the shooting, the Petitioner was sitting on the couch with L.M. and trying to "Facetime" with Ms. Vasquez. He said that the victim was standing in front of him by the bathroom door and began opining that the court would not give the Petitioner custody of their son. The Petitioner felt the victim was trying to make him feel bad but also asking him to spend time with L.M.

The Petitioner stated that L.M. was sitting on the Petitioner's leg, and they were watching television while L.M. was trying to get his cell phone. The Petitioner said that he was also texting Ms. Vasquez to let her know that he was getting ready to leave. He asserted that L.M. then said, "Look, Daddy, Mommy has a gun." The Petitioner testified that the victim was in the kitchen, and he heard a "click" noise. He pushed L.M. and told him to "run." The Petitioner testified that he ran toward the victim and grabbed her arms, pushing her back against the wall. He noted that the gun was in her hand at an odd angle, not the way someone would normally hold a gun.

6

The Petitioner testified that he tried to hold the victim, but she pushed off the wall, and as they struggled, he pleaded with the victim to drop the gun. He said that the victim kept repeating "You, you, you, you." A shot then went off and gun dropped from the victim's hand. The Petitioner said that he did not fire the gun or have control of it. He admitted to later taking the gun from the victim's right side to "dismantle it."

The Petitioner ran downstairs and called "police" and then checked himself to make sure that he was not injured. He then ran upstairs to see if he could hear anything from the victim. The Petitioner said that he eventually went to a neighbor's house while still on the phone with the 911 operator because he did not know the victim's address.

On cross-examination, concerning his search history, the Petitioner testified that the searches were in reference to a television show he had seen. The Petitioner deleted any web history that reflected negatively on him because he never locked his cell phone, and anyone could access it. The Petitioner admitted that he searched firearms and purchased a gun on March 26 or 27, 2018. He said that he did not have a reason to buy the gun through legitimate means, and he met Mr. O'Neal and purchased it with cash to give it to the victim to guarantee L.M.'s safety. The victim told him that the only way he could see L.M. is if he purchased her the weapon. He lied to police about the weapon until they confronted him with Mr. O'Neal's statement.

The Petitioner agreed he had never paid child support for L.M. but was set to start shortly before the shooting. He said that he and the victim were in a custody dispute. The Petitioner said that the victim initially pointed the gun at him, and he moved out of the way and then ran toward her. He said that he grabbed both of her arms in order to get the gun and pushed her back against the wall. The Petitioner did not let go of the victim until the "gun went off." He said that the victim was "flailing" and using her head to push him on the table when the gun fired. The Petitioner kicked the gun away after the victim fell to the floor, and he eventually took the magazine out of it and placed it away from the victim's body.

Based upon this evidence, the jury convicted the Petitioner of first-degree murder, and the trial court sentenced him to life in prison to be served consecutively to his prior three-year sentence for aggravated assault.

## B. Post-Conviction DNA and Fingerprint Analysis

On September 24, 2024, the Petitioner, *pro se*, filed a petition pursuant to the Post-Conviction Fingerprint Analysis Act of 2021 ("the Fingerprint Analysis Act") and also the DNA Post-Conviction Relief Act. In it he asked for both DNA and fingerprint testing of evidence in his case. He said that the police recovered a "laser" sight in the victim's home,

and he asked that it be tested for DNA and fingerprint evidence. He also said that his DNA was not found underneath the victim's fingernails or on the firearm. He said that all the physical evidence supported his version of events.

In his argument, the Petitioner contended that, if DNA testing of the laser sight showed Mr. Smith's DNA, this evidence would have allowed the Petitioner to disprove a critical component of the State's theory and support the Petitioner's claim that he purchased this weapon at the victim's behest. He further averred that his trial counsel was ineffective when she failed to ask that the laser sight be tested.

The Petitioner similarly asked that the murder weapon, magazine, and shell casings be DNA tested against samples from the victim, Mr. Smith and Ms. Murphy. He said his trial counsel was ineffective for failing to have this testing completed.

The State responded that one of the requirements of the applicable post-conviction act was that a reasonable probability existed that the Petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis. It noted that the laser sight was found in the victim's bedroom, while the victim's body was found in her kitchen with a gunshot wound into her chin and the gun by her feet. The Petitioner called 911 and reported that the victim was shot and that she had been shot during a struggle between himself and her over the gun after she pointed the gun at him. The State posited that the Petitioner had failed to establish how DNA on a laser sight located in a separate room would exculpate the Petitioner.

The trial court agreed. It found that "The presence of her DNA, or anyone else's, would not have provided exculpatory evidence under the facts of this case." The court noted that the Petitioner's theory in this case was that the victim had the gun and she and the Petitioner wrestled over it before she pulled the trigger, shooting herself at close range. Under both the Petitioner and the State's theories, the victim's DNA could easily be transferred to the gun.

As to the laser sight, the trial court found that, even if Mr. Smith or Ms. Murphy had touched the gun or the laser sight, it would not amount to proof sufficient to raise a reasonable probability that the Petitioner would not have been prosecuted or resulted in a different verdict. The Petitioner had testified at trial that only he and the victim were present during the shooting. The trial court summarily dismissed the Petitioner's petition.

It is from this judgment that the Petitioner now appeals.

## II. Analysis

8

On appeal, the Petitioner contends that the post-conviction court erred when it summarily dismissed his petition for post-conviction relief pursuant to the DNA Post-Conviction Relief Act. He asserts that the post-conviction court erred when it determined that DNA analysis would not have amounted to proof sufficient to raise a reasonable probability of a different verdict. He further contends that proving that the State's "Star witnesses Waynesha Murphy and Nicholas Smith committed perjury would have been a material component of the Defense." The State counters that the trial court properly denied the petition. We agree with the State.

Under the DNA Act, a person convicted of and sentenced for first degree murder may, at any time, file a petition "requesting the forensic DNA analysis of any evidence that is in the possession or control of the prosecution, law enforcement, laboratory, or court, and that is related to the investigation or prosecution that resulted in the judgment of conviction and that may contain biological evidence." T.C.A. § 40-30-303. Upon the petitioner's request, the trial court shall order DNA analysis if the following four requirements are met:

> (1) A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis;
> (2) The evidence is still in existence and in such a condition that DNA analysis may be conducted;
> (3) The evidence was never previously subjected to DNA analysis or was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis; and
> (4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

T.C.A. § 40-30-304.

If a petition does not meet the criteria for mandatory testing, a post-conviction court has discretion to order testing if a "reasonable probability exists that analysis of the evidence will produce DNA results that would have rendered the petitioner's verdict or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction" and the criteria in (2), (3), and (4) are met. T.C.A. § 40-30-305. A "reasonable probability" means "a probability sufficient to undermine confidence in the outcome." *Powers v. State*, 343 S.W.3d 36, 54 (Tenn. 2011) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009) (citations and quotation marks omitted). Although the post-conviction court must presume that the DNA analysis at issue is exculpatory or

9

favorable to the defense, the court "must focus on the strength of the DNA evidence as compared to the evidence presented at trial." *Id*. at 55.

In his petition for post-conviction DNA analysis, Petitioner sought comparison of DNA found on the weapon, magazine, and shell casings found near the victim's body to samples from Mr. Smith and Ms. Murphy. He further asked for DNA analysis comparison of any DNA found on a laser sight found in the victim's bedroom to samples from the victim, Mr. Smith, and Ms. Murphy. The post-conviction court determined that there was not a reasonable probability that the Petitioner would not have been charged or convicted even if testing showed DNA from other individuals on any of those items.

According to the Petitioner's account, he purchased the weapon some time before the shooting and gave it to the victim. Shortly before the shooting, the two struggled over the weapon, and the victim shot herself. After the shooting, he handled the weapon, dismantling and disarming it. The Petitioner offered his version of events to the jury, and it rejected that the victim shot herself and instead found that the Petitioner had shot the victim with premeditation.

Any DNA testing results would not exculpate the Petitioner, one of the only two people there during the shooting, even if it showed that someone else handled the weapon, magazine, or shell casings. By the Petitioner's own testimony, only he, the victim, and L.M. were present during the shooting. DNA testing that showed that Mr. Smith or Ms. Murphy handled the weapon, magazine, or shell casing could provide potential impeachment of Mr. Smith and Ms. Murphy's testimony that they never saw the pink handgun, or any handgun, before the shooting, but this still does not exculpate the Petitioner on the day of the shooting. We therefore agree with the trial court that the Petitioner cannot prove, "A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis," so he is not entitled to relief.

We similarly conclude that any DNA testing of the laser sight found in the victim's bedroom would not exculpate the Petitioner. The laser sight was not attached to the weapon at the time of the shooting, and it was not in the same room as the shooting. If DNA testing of the laser sight provided a match to any or all three of the DNA samples proposed by the Petitioner, i.e. the victim, Mr. Smith, or Ms. Murphy, it would not show that they fired the weapon. The Petitioner proposes that it would perhaps impeach the testimony of Mr. Smith or Ms. Murphy that the victim did not have a weapon or want a weapon in her home. While this may be of some impeachment value, it does not rise to the level required for the relief the Petitioner seeks. The DNA testing proposed by the Petitioner would not produce results that would create a reasonable probability that the Petitioner would not have been

prosecuted or convicted.  As such, we conclude that the post-conviction court did not err when it dismissed the Petitioner's petition. The Petitioner is not entitled to relief.

### III. Conclusion

Based on the foregoing reasoning, the judgment of the post-conviction court is affirmed.

_____s/ *ROBERT W. WEDEMEYER*_____
ROBERT W. WEDEMEYER, JUDGE